In the Interest of: E.A. and N.A., Minor Children.

A.A., Father, Appellant.

No. 95–1519.

Supreme Court of Iowa.

July 24, 1996.

M. Leanne Tyler of Soper & Tyler, P.C., Davenport, for appellant father.

Murray W. Bell of Newport, Bell & Oxley, Davenport, for appellant mother.

Thomas J. Miller, Attorney General, Diane Stahle, Special Assistant Attorney General, Judy Sheirbon and Maureen McGuire, Assistant Attorneys General, and Henry C. Fil-

seth, Assistant County Attorney, for appellee State.

Cynthia Z. Taylor of Zamora, Taylor & Walters, Davenport, for the children.

Considered by McGIVERIN, C.J., and LARSON, CARTER, SNELL, and ANDREASEN, JJ.

CARTER, Justice.

A.A. (Art) appeals from a juvenile court order adjudicating his two minor children to be in need of assistance, placing them in their mother's physical care, and granting him only supervised visitation. He contends that because Ohio was the home state of the children and their custody was at issue in a marriage dissolution action pending in that state, the Iowa juvenile court was without jurisdiction under the Uniform Child Custody Jurisdiction Act, Iowa Code ch. 598A (1995) (UCCJA). He further contends that if the juvenile court had jurisdiction its findings are not supported by clear and convincing evidence and it improperly based its order on a theory not argued by the State. We reject all of these contentions and affirm the orders of the juvenile court.

Art and Shawn are married and have two children, Noah, born October 15, 1985, and Elijah, born May 5, 1991. The family resided in Ohio for six years prior to 1994. In September 1994 Shawn came to Iowa with the children and resided with Shawn's mother.

In November 1994 Art filed a petition for dissolution of marriage in Ohio. On November 18, 1994, the Iowa District Court for Scott County held a hearing on a domestic violence petition filed by Shawn. The Iowa court ordered the matter of child custody resolved in the Ohio dissolution proceeding, as Ohio was the children's "home state" pursuant to the UCCJA.

The parties remained in Iowa through the time of the challenged child-in-need-of-assistance (CINA) hearing. Art moved into a hotel and exercised visitation with the children. On January 7, 1995, Art contacted Iowa child abuse authorities and made a sexual abuse referral, alleging that Shawn's family was acting improperly toward the chil-

dren. He and the children were then in Ohio, and Ohio authorities were asked to do a courtesy interview. The children were interviewed in Art's presence. After the interview, Ohio investigators informed Iowa authorities that Ohio would not be taking action to prevent Shawn from regaining custody at the end of Art's visitation. Art took the boys for physical examinations in Ohio on January 9. The examining physician reported Elijah told about being abused by his uncle and grandma. The doctor recommended that the children be taken out of their grandmother's house.

On January 11, 1995, an Ohio court filed an order temporarily awarding Art custody of the children every night and every other day. Shawn was awarded visitation every other day and was not to allow the children to be in contact with Shawn's mother or brother. It also ordered Noah to return to school in Iowa. Art and Shawn were ordered to cooperate with the Iowa child abuse authorities.

Art made additional reports of sexual abuse to Iowa authorities. On January 17, 1995, the department filed petitions to find that Noah and Elijah were children in need of assistance under Iowa Code sections 232.2(6)(b) (child physically abused or neglected), (c)(1) (child suffering harmful effects of mental injury caused by the acts of parent), and (c)(2) (child suffering harmful effects of parent's failure to properly supervise). No specific allegations were made in the petition.

On January 17 the department also sought removal of the children from Art on the ground that the sexual abuse allegations were fabricated by him. The Iowa District Court for Scott County granted the request for temporary removal and ordered the boys placed in their mother's physical care. Following a temporary placement hearing, that placement was continued based on a finding that removal from the father's care was necessary to avoid imminent risk to the children's mental health. The boys were not to be left alone with their uncle, and Art was ordered to have only supervised visits.

The Iowa investigator prepared a sixty-seven-page report after an extensive investi-

gation was conducted. The investigator concluded Noah gave no history of sexual abuse being perpetrated upon him. The investigator noted that, although Elijah reported that grandma and uncle play "weenie wars" and "tag by the butt" with him, when asked how, when, and where those games were played Elijah did not know. The report noted Shawn's numerous reports of abusive, controlling and manipulative behavior by Art. The investigator concluded:

> The Department of Human Services is totally aware of, and has attempted to document, the dysfunctions and ongoing problems of the relationship and/or common law marriage of [the parents] that has undoubtedly influenced and complicated this case. Child protection agencies are faced with allegations of abuse often in dissolution or child custody cases.... [I]t is the D.H.S. conclusion that the referred child, Elijah, is not a victim of sexual abuse in the home of his maternal grandmother ... and the care and custody of his mother.

> This case has characteristics of dysfunction consistent with a relationship of domestic violence with the main issue of power and control contributing to this allegation of sexual abuse and subsequent investigation. In regard to the abuse issues, D.H.S. questions the emotional impact this case has had on the children and presented this case to a child abuse expert at University of Iowa Hospitals and Clinics. D.H.S. was instructed that the elements were there but the final determination would determine [depend upon?] the finding through a psychological diagnosis by a qualified mental health professional.... Mental injury, therefore, is undetermined at this time on Art. D.H.S. strongly recommends that through the evaluative procedures of the children this report be reviewed for the content and history of this family.

>    ....

D.H.S. continues [to recommend Shawn have physical care of the children.] During the course of the investigation, there have been suspicions by [Shawn], Bettendorf Police, the community, and D.H.S. that Art has been stalking his ex-wife.

With past domestic assault and recent alleged stalking activity, D.H.S. requests Juvenile Court intervention to protect this Bettendorf family.

An adjudication hearing was held on May 17 and June 9, 1995. On July 14, 1995, the district court adjudicated Noah and Elijah to be children in need of assistance. The court found there was not clear and convincing evidence the children were sexually abused, but there was credible evidence that Elijah's knowledge and expressions of sexual matters came "vicariously from other persons, most likely his father." The court found:

> [A] significant issue is the antagonism of the parents in their struggle for custody. Compelling is the father's history of domestic violence, power, and control in this family.... These facts present a continuing high risk of abuse of the mother. The court views this as potentially abusive to the children in an emotional sense and interferes with and distracts the mother from providing appropriate care and supervision for the children. *The basis for the adjudication is the continued risk of abuse and neglect and impaired supervision of the children due to the intense antagonism between the estranged parents and the threat of domestic violence perpetrated by the father upon the mother.*

(Emphasis added.)

Following a subsequent hearing, the juvenile court filed a dispositional order placing Noah and Elijah in Shawn's custody. The court noted:

> The State of Ohio has asserted a prior jurisdiction through the commencement of dissolution of marriage in that state. This Court only assumed jurisdiction to protect the interests of the children upon the initiation of the child protective investigation and the adjudication upon the CINA Petition that followed.... [T]he Court views its responsibility in this case merely to manage the risk of adjudicatory harm. Management of that risk includes in the Court's view supervision of visitation between the children and the father so long as the children and mother remain in the state of Iowa, and so long as necessary

until the State of Ohio is able to litigate the issues in the dissolution.

Other facts relevant to deciding the appeal will be discussed in connection with the legal issues presented.

## I. Appellee's Motion to Expand the Record.

■ Before considering the issues that have been argued in the briefs of the parties, we must dispose of a motion filed by the appellee on the eve of argument. That motion asserts that the issues concerning the children's home state under the UCCJA are now moot because the parties dissolution-of-marriage action in Ohio has been dismissed, and due to the passage of time, Iowa is now clearly the children's home state. We disagree with the legal premise on which this motion is based. The issue before us is whether the juvenile court had subject matter jurisdiction at the time the challenged orders were made. If it did not, this deficiency may not be cured retroactively by matters that have transpired since the orders were made. Consequently, we deny the motion to expand the record.

## II. Whether the Juvenile Court Properly Assumed Jurisdiction Under the Uniform Child Custody Jurisdiction Act.

■ Under Iowa Code section 598A.2(2), custody determinations subject to the UCCJA include any court order "providing for custody of a child, including visitation rights." This broad language of inclusion would appear to include juvenile court orders in CINA cases. On the other hand, we have recognized that application of the act should be tempered by its overall purposes. *Slidell v. Valentine*, 298 N.W.2d 599, 603 (Iowa 1980). Because the main thrust of this legislation is to restrict custody disputes between competing parents to reasonable venues, it may, we believe, be given a less restrictive application in juvenile court proceedings initiated by state welfare agencies.

■ Art's attack on the subject matter jurisdiction of the Iowa juvenile court is premised on the undisputed fact that Ohio was the "home state" of these children at the time the challenged orders were made and the Ohio courts had assumed jurisdiction of the child custody issues between the parties in a pending dissolution-of-marriage action in that state. We note in this regard that the Iowa juvenile court's order clearly recognized that Ohio was the home state for purposes of the UCCJA and that the court was also aware of the parties' pending dissolution action in which custody was an issue. It made reference to both of those matters in its dispositional order. Notwithstanding these factors, we are confident that the Iowa juvenile court did have subject matter jurisdiction for the limited purpose of protecting the children from risks of harm arising during their presence in this state. The court's purpose is clear from the language of its order. It is provided in the UCCJA that a court can assume jurisdiction, notwithstanding its lack of home state status, if

it is in the best interest of the child that a court of this state assume jurisdiction because the child and the child's parents or the child and at least one contestant, have a significant connection with this state, and there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships.

Iowa Code § 598A.3(1)(b).

In this case, there was a significant connection with Iowa and substantial evidence was available in this state. There was an ongoing child abuse investigation here, which the Ohio courts recognized could best be performed by Iowa authorities. The alleged perpetrators and victims of sex abuse were living in Iowa at the time of the alleged abuse and were still present here when the Iowa juvenile court's orders were issued. Other significant contacts with this state included the fact that the oldest child had been attending school in Iowa since September 1994, and the desirability of maintaining that attendance was recognized in an order of the Ohio court. When the ongoing investigation resulted in findings that the children were presently exposed to harm as a result of Art's activities, the Iowa juvenile court properly assumed jurisdiction to protect the chil-

dren pending a final determination of custody issues in the Ohio dissolution proceeding. We are convinced that it was authorized to take that action under the provisions of section 598A.3(1)(b), notwithstanding the temporary custody order of the Ohio court.[1]

### III. Sufficiency of the Evidence to Support the Juvenile Court's Findings.

Art contends that the Iowa child abuse investigators erred in believing the mother's version of the parents' relationship and that the juvenile court improperly relied on those conclusions. We find, however, that the record does support, based on clear and convincing evidence, the juvenile court's finding that Art had been physically and emotionally abusive to the mother in the presence of Noah and Elijah. This was, we believe, to a high degree of probability, a source of potential harm to their well-being. The child abuse investigator documented the mother's descriptions of his slapping, kicking, pushing, spitting, and throwing things at her and repeatedly making degrading comments about her in the children's presence.

It is apparent from the record that, subsequent to the parties' separation, Art has used his visitation contacts as an opportunity to influence the children adversely toward their mother and has acted in a controlling, intimidating manner. The children had seen a psychologist on approximately five occasions, and although they were found not to be suffering from a mental injury or illness, the psychologist expressed concern about their future mental health given the current parental relationship. The psychologist recommended that the father's visits be supervised.

Family circumstances marked with instability have been recognized as sufficient cause to adjudicate the children of that family in need of assistance. *In re M.H.*, 444 N.W.2d 110, 111 (Iowa App.1989). Because the parties were present in this state, it was not only an option but the duty of the Iowa juvenile court to take such action as was necessary in this regard to prevent harm to these minor children.

### IV. Adjudication of Issues Based on Theories Not Argued by the State.

As a final issue, Art contends that he was denied due process because the juvenile court based its order on a theory not being argued by the State. He contends that the State's only contention that the children should be adjudicated in need of assistance was a perception of adjudicatory harm, *i.e.*, interference with the children as witnesses in the adjudication of claimed child abuse. The court instead concluded that two statutory grounds for a CINA finding were satisfied by the potential harm to the children from exposure to parental altercations and Art's manipulative efforts.[2] We are unable to conclude that the court was bound to render a decision based on the same theory advanced by the State if the evidence sustained the statutory grounds as a result of other factors. We find no due process denial in the manner in which the court adjudicated the controversy nor do we find any procedural irregularity that would warrant an overturning of the court's order.

We have considered all issues presented and conclude that the order of the juvenile court should be affirmed.

**AFFIRMED.**

---

1. We reach this conclusion in part because we believe that an Iowa juvenile court in a CINA proceeding would not be bound to honor a custody determination of an Iowa court of general jurisdiction.

2. These were:
   (1) Iowa Code § 232.2(6)(b), which relates to a child
   [w]hose parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child.
   (2) Iowa Code § 232.2(6)(c)(2), which relates to
   [t]he failure of the child's parent, guardian, custodian, or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child.